**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

LEGEND LAKE PROPERTY OWNERS
ASSOCIATION, INC., et al.,

        **Plaintiffs,**

    **v.**                    **Case No. 24-C-1369**

MENOMINEE COUNTY, et al.,

        **Defendants.**

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Legend Lake Property Owners Association, Inc. (the Association) brought this 42 U.S.C. § 1983 action against Defendants Menominee County, the Town of Menominee, and the Menominee Indian School District (MISD), seeking relief from the increasing taxes assessed against the property of its members. The Association alleged Defendants violated the Fourteenth Amendment by denying the Association's members' rights to equal protection of the law and substantive due process as well as the Fifth Amendment by unlawful exercise of eminent domain. The Association also alleged violations of the Wisconsin Constitution.

On January 31, 2025, MISD filed a motion to dismiss the original complaint. Dkt. No. 8. The County and Town joined the motion on February 13, 2025. Dkt. No. 11. The court held oral argument on the motion on April 22, 2025. During the hearing, the court invited the Association to file an amended complaint to cure potential defects identified by Defendants and the court. The Association filed an amended complaint on May 13, 2025. The amended complaint added Timothy J. Houselog, Russell Timmers, Dawn Mauthe, and Robert Klingelhoets as plaintiffs, all of whom are members of the Association. On June 3, 2025, MISD filed a motion to dismiss the

amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). Dkt. No. 26. That same day, the County and Town filed their own motion to dismiss. Dkt. No. 28. Both motions are now fully briefed and ready for decision. For the following reasons, Defendants' motions will be granted and the case dismissed.

## BACKGROUND

The Menominee Indian Tribe of Wisconsin is a federally recognized Indian Tribe, whose reservation was established by the Treaty of Wolf River in 1854. Am. Compl. ¶ 13, Dkt. No. 23; *see also Menominee Tribe of Indians v. United States*, 391 U.S. 404, 405 (1968). In 1954, the Menominee reservation was approximately 235,523 acres in size and was located within the entirety of what is now Menominee County, Wisconsin. Am. Compl. ¶ 15. That same year, Congress enacted the Menominee Indian Termination Act, which terminated the status of the Menominee Tribe and set 1958 as the year the termination would take effect. *Id.* ¶¶ 16–17; *see also* Pub. L. No. 83-397, 68 Stat. 250 (1954). On July 3, 1959, Menominee County became Wisconsin's seventy-second county. Am. Compl. ¶ 18. Menominee Township is coterminous with the County.

Several years after the Termination Act took effect, the Tribe settled on a Termination Plan under which the tribal property was transferred to a corporation called Menominee Enterprises, Inc. *Id.* ¶ 20. Under the Termination Plan, all enrolled members of the Tribe became shareholders of Menominee Enterprises. *Id.* ¶ 21. In 1967, Menominee Enterprises voted to create an economic development zone, and in 1968, Menominee Enterprises contracted with a developer to create the development which came to be called Legend Lake. *Id.* ¶¶ 24–25. The Legend Lake Development consisted of 5,160 acres of land and was platted into 2,741 lots, including 41 "beach club" lots through which all lot owners would have lake access. *Id.* ¶¶ 27–28. About 1,900 of the lots in the Legend Lake development were sold to members of the general public. *Id.* ¶ 29.

2

Even before Menominee Enterprises had voted to create an economic development zone and contracted with the Legend Lake developer, the Menominee Council of Chiefs had formed a non-profit organization and began a petition requesting restoration of tribal status and repeal of the Menominee Termination Act. *Id.* ¶¶ 22–23. As the political advocacy for tribal restoration grew, Legend Lake lot owners expressed concern that they would be unfairly taxed on their property if the Menominee Reservation was restored and most of the land in the Town and County were placed into trust status and thus removed from the tax rolls. *Id.* ¶ 29. The concern was that Menominee County officials, who would likely be Menominee Indians since tribal members made up the vast majority of voters in the County, would overtax the non-tribal member property owners who would be virtually the only taxpayers in the County. *Id.* ¶¶ 29, 31. At congressional hearings on the Restoration Act, Congress was assured that passage of the Act would not result in unfair or inequitable taxation of the property tax paying landowners in Menominee County. In at least partial reliance on such assurances, Congress passed the Federal Menominee Restoration Act in 1973. *Id.* ¶¶ 31–32.

The Menominee Restoration Act repealed the Termination Act and its prior termination policies. *See* Pub. L. No. 93-197, 87 Stat. 770. The Restoration Act restored federal recognition of the Menominee Tribe and provides that "[t]he Secretary shall accept the real property (excluding real property not located in or adjacent to the territory constituting, on the effective date of this Act, the county of Menominee, Wisconsin) of members of the Menominee Tribe, but only if transferred to him by the Menominee owner or owners." *Id.* at 773. Since the Restoration Act restored the Menominee Tribe's status, the Tribe's stated goal is to acquire all of the lots in Menominee County and to place them in trust. Am. Compl. ¶ 34.

Today, approximately 99% of the land in Menominee County has been transferred to the Secretary and is held in trust by the federal government for the benefit of the Tribe. *See id.* ¶ 37.

3

Within the remaining 1% of the County land are the lots in the Legend Lake development that were sold to members of the general public. The owners of about 1,800 of those lots make up the membership of the Association, which was created in 1972. *Id.* ¶¶ 1, 40. Houselog, Timmers, Mauthe, and Klingelhoets are four members of the Association who own residences on Legend Lake.

Menominee County and the Town of Menominee are municipal corporations established under and governed by Wisconsin law. *Id.* ¶¶ 9–10. The Menominee Indian School District and the taxation district it controls are organized under and enabled by Wisconsin law. *Id.* ¶ 11. Annually, MISD calculates a property tax levy, which it forwards to the Town for allocation and billing to the owners of taxable property. Land held in trust for the benefit of the Menominee Tribe is not subject to taxation. *Id.* ¶ 35. As a result, property taxes are only levied against about 1% of the land in the County. *Id.* ¶ 38. The majority of the taxable property in the County is within the Legend Lake development. *Id.* ¶ 40. Plaintiffs assert that the yearly assessed values of their homes and property taxes are excessively high.

As an example, Timmers owns property on Legend Lake that serves as his second residence. *Id.* ¶ 7. The assessed value and property taxes for his property for the last ten years are shown below:

| Year | Assessed Value | Property Taxes |
|------|----------------|----------------|
| 2015 | $322,400 | $6,048.09 |
| 2016 | $322,400 | $5,609.52 |
| 2017 | $322,400 | $5,478.35 |
| 2018 | $322,400 | $5,736.87 |
| 2019 | $330,800 | $6,241.40 |
| 2020 | $330,800 | $6,324.15 |
| 2021 | $330,800 | $6,433.86 |
| 2022 | $330,800 | $9,050.70 |
| 2023 | $330,800 | $8,725.77 |
| 2024 | $809,000 | $9,886.96 |

4

*Id.* ¶ 8. From 2023 to 2024, the assessed value of Timmer's house rose 145%, even though there had been no renovations or improvements in the last ten years. *Id.* Timmers was charged property taxes by the Town at a rate of 1.22% in 2024, 2.64% in 2023, and 2.74% in 2022. *Id.* The property tax rates are calculated by dividing the total tax amount by the assessed property value. Mauthe and Klingelhoets were also charged property taxes by the Town at a rate of 2.64% in 2023, which dropped to 1.22% in 2024 after their properties were reassessed. *Id.* ¶¶ 4, 6. Houselog's property tax rate in 2023 was 2.64% and 1.17% in 2024. *Id.* ¶ 3.

Plaintiffs assert that, as of 2024, the current tax rates on property tax–paying parcels in the County are not only the highest in the State of Wisconsin but are some of the highest in the nation. *Id.* ¶ 52. They allege that these property tax rates are comparable to those levied in major metropolitan areas where municipalities provide an array of public services not provided by Menominee County. *Id.* ¶ 12. They assert that the majority of the roads are unpaved; there is little in the way of municipal utilities, as most of the properties are on well and septic; there is an extremely small sheriff's department; and there is minimal budget for governmental staff. *Id.* Plaintiffs contend that the reason their rates are so high is because "the entire levy falls upon the shoulders of a small minority in the County which is not exempt from property taxes" and MISD levies significant taxes on them. *Id.*

Plaintiffs note that the State of Wisconsin recognized the property tax issues that the Association complains of as early as the 1990s. *Id.* ¶ 47. In 1998, a Wisconsin Legislative Audit Bureau Report noted that for all taxable property in the County, "94.4 percent of assessed value is in the lakes area and 5.6 percent is elsewhere." *Id.* ¶ 48. The report also observed that tax bills in the County are "high in comparison to those in most of the surrounding towns and in comparison to bills paid in other towns with lake property." *Id.* ¶ 49. It noted that uncertainty about the County's financial future is created by:

5

- An existing deficit in both the county and the town that will be difficult to eliminate given the statutory limit on the county's levy;

- Current tax bills that are among the highest in the area and that are high in comparison with other areas where property values have increased rapidly;

- The very limited potential for growth in the tax base by other than continued increases in the value of existing property;

- The potential for further acquisitions of currently taxable land by the Tribe if gaming compact negotiations result in an expansion of gaming activity and increased revenues to the Tribe; and

- Uncertainty about the Tribe's interest in holding some of its land outside the federal trust and on the tax rolls in order to encourage development.

*Id.* ¶ 50.  Plaintiffs allege that, over the past 26 years, very little progress has been made regarding the concerns identified in the Wisconsin Legislative Audit Bureau Report and that the situation has become worse.  *Id.* ¶ 51.

Plaintiffs contend that the acquisition of taxable land by the Menominee Tribe has continued over the last 26 years and has increased in recent years.  *Id.* ¶ 53.  Substantial gaming and other revenues have supported the Tribe's additional land purchases, as was predicted by the 1998 Report.  *Id.* ¶ 54.  Plaintiffs assert that the Menominee Tribe has received and continues to receive federal and state aid on an annual basis.  *Id.* ¶ 55.  From 2014 through 2023, the Menominee Tribe received nearly $1 billion in income and government aid.  *Id.* ¶ 57.  In 2023, in particular, the Menominee Tribe's income sources included:

| | |
|---|---|
| Total Tribe: | $43,290,280 |
| Total Federal: | $71,468,010 |
| Total State: | $6,274,936 |
| Total Local and Other: | <u>$2,974,431</u> |
| **Grand Total:** | **$124,007,658** |

*Id.* ¶ 56.  Plaintiffs contend that the Menominee Tribe is currently seeking an award of casino rights in Kenosha County which, if approved, will substantially increase its income sources and

6

fund additional land acquisitions in Menominee County, removing these properties from the tax rolls, and further increasing the burden on the remaining property tax–payers. *Id.* ¶ 58.

According to Plaintiffs, Defendants and the Tribe maintain a discriminatory campaign wherein taxation is used to force nontribal residents—like Plaintiffs—to sell their land to the Tribe so that it can be placed into trust. Plaintiffs point to a number of practices that they allege reflect this discriminatory campaign.

First, Plaintiffs cite to a 2006 Special Agreement entered between the Menominee Tribe and the County. *Id.* ¶ 67. The 2006 Agreement was executed by Karen Washinawatok, Tribal Chair, and Randy Reiter, Menominee County Board Chair and an enrolled member of the Menominee Tribe. *Id.* ¶ 68. Under the agreement, each year before March 1, the Tribe is allowed to provide the County with a list of properties that it intends to place into trust. *Id.* ¶ 67. Once the County receives the list of properties, the County takes those properties off the tax base for that year. *Id.* The Menominee Tribe has submitted property lists to the County every year from 2006 through 2023. *Id.* ¶ 69. To date, 120 formerly taxable properties have been taken off the tax base, even though the large majority of the properties have not been placed into trust. *Id.* In addition to the properties removed from the tax base under the 2006 Agreement, Plaintiff alleges that there are 154 properties purchased by Menominee Tribal members that have not been placed in trust and have either not been taxed for multiple years or have been taxed and no payment has been made, and penalties continue to accrue but are not pursued by the County. *Id.* ¶¶ 70–71.

Second, less than 1% of the yearly property taxes in Menominee County comes from commercial or industrial property taxes. *Id.* ¶ 44. According to the account coordinator for the County's Assessor, for 2023, while the overall property taxes paid to the County totaled $9,566,399, the commercial property taxes paid to the County only amounted to $84,399, or 0.88% of the County's tax revenue. *Id.* ¶ 45. Plaintiffs assert that, in the rest of the State of Wisconsin,

commercial property taxes typically account for 25 to 33% of a county's tax revenue. *Id.* ¶ 46. They conclude that the County and the Town have avoided creating a commercial tax base as part of an intentional effort to increase the tax burden on the Association and its members in order to force the sale of those properties to the Menominee Tribe. *Id.*

Third, Plaintiffs assert that, in Menominee County, there are at least three non-property tax–paying voters for every property tax–paying voter. *Id.* ¶ 41. As a result, the non-property tax–paying voters can vote their preferred candidates onto the County Board and the MISD School Board. *Id.* ¶ 42. Plaintiffs contend that the elected officials of the County Board, Town Board, and School Board approve property tax increases that fall upon those few property tax–payers, who are mostly nontribal members, without any concern for financial consequences (because they do not pay property taxes themselves) or political consequences (because their political decisions favor the goals of the majority of the voters). *Id.* They assert that there is a prevalent animus against the voters who are property tax–payers. *Id.* ¶ 43.

Plaintiffs point to recent decisions to build a new $52 million high school and "give away" other school property to the Tribe. In 2022, MISD notified taxpayers in a flier mailed to residents of Menominee County of an impending $35 million school referendum to build a new 110,000 square foot high school for a student population of less than 300 students (as of 2022). *Id.* ¶ 72. With interest and fees associated with the loan, the total cost of the project is $52 million. *Id.* Under the plan, the existing 100,000 square foot high school would be repurposed for use as the middle school. *Id.* ¶ 73.

Plaintiffs allege that Menominee County taxpayers, including many members of the Association, asked questions about the purpose and basis for the referendum prior to its passage but did not receive any answers. *Id.* ¶ 74. They assert that it was eventually uncovered that no real needs analysis had been performed to justify the high-cost referendum. Taxpayers also

8

discovered that, as of March 23, 2021, MISD had been exploring a plan to renovate the school at a cost of only $14,400,000, which included $2,200,000 for classrooms, $10,300,000 for a fieldhouse, and $1,900,000 for a bus garage. *Id.* MISD then hired a consulting firm to analyze the maximum amount of money MISD could levy. The consulting firm's analysis revealed that, under law, the maximum amount that MISD could levy was approximately $39,500,000, which was based upon a levy of 10% of the total equalized value at the time, or $395,000,000. *Id.*

Plaintiffs contend that MISD also increased its operating budget by $1,200,000 from 2022 to 2023, even though previous annual increases in its budget had been around $100,000 per year. *Id.* They allege that MISD never articulated any need or explanation for the $1,200,000 budgetary increase and that MISD and its schools are not underfunded. *Id.* ¶¶ 75–76. To the contrary, as documented by the Wisconsin Department of Public Instruction, MISD funding prior to the 2022 referendum was $25,000 per student, which is nearly $9,000 above the state average of $16,000 per student. *Id.* ¶ 76. Plaintiffs believe that MISD simply increased its operating budget to the maximum amount allowable under applicable law as calculated by its consultants. *Id.* ¶ 75. They maintain that the operating budget increase was almost as much as the amount charged for the first year's referendum principal and interest payment of $1,295,000 and is why each taxpayer in the County saw nearly a 100% increase in their school property taxes from 2022 to 2023, while the "non-taxable" did not incur any financial burden. *Id.* ¶ 78.

In addition, on May 7, 2024, MISD entered into an Offer to Exchange with the Menominee Tribe. *Id.* ¶ 86. The terms of the Offer to Exchange required that the Tribe pay only $1.00 for full ownership of the existing middle school building and property in Neopit, which is owned by MISD. *Id.* ¶ 87. The middle school building and property is currently valued at $1.6 million. *Id.* ¶ 88. The Offer to Exchange also provided that the Menominee Tribe will lease, as a landlord to MISD, ten acres of land (of which only six acres are buildable), for the development of three

9

baseball diamonds. *Id.* ¶ 89. Plaintiffs believe that MISD will enter into a separate lease agreement, under which it will be obligated to pay monthly lease payments to the Tribe and spend large sums to build the athletic fields. *Id.* No lease terms have been made public by MISD or the Tribe. Plaintiffs assert that, in Wisconsin, public school districts are generally not permitted to give away school buildings funded by taxpayers to private entities without due legal process and following strict regulations. *Id.* ¶ 83. They contend that this transaction was structured in a way that it benefited the Tribe and increased the property tax burden on Plaintiffs and the Association's members. *Id.* ¶ 89.

Fourth, in 2024, the Town increased the assessed values of taxpaying parcels by an average of 114% on short notice. On Thursday, August 22, 2024, the taxpaying property owners received a letter from the Town's assessor, Accurate Appraisal, LLC, indicating that their properties had been revalued. *Id.* ¶ 104. As an example, the property of Mark and Amy Schoen located on Thunderbird Road on Legend Lake was revalued from $313,800 to $693,200, which is a $379,400 change equal to a 120.9% increase. *Id.* ¶ 105. The letter indicated that if landowners disagreed with the revaluation, they were required to attend an open book session four days later, on Monday, August 26, 2024. *Id.* ¶ 106. The landowners had extremely limited time to prepare an objection and many received no notice if, for example, they were away at the time the letter was sent. *Id.* ¶ 107.

Plaintiffs contend that the revaluation did not immediately increase the net amount of taxes that each taxpayer paid because the mill rate was lowered. *Id.* ¶ 108. They allege that the increase in each property's assessed value, which in many cases was extremely unrealistic and unrelated to actual value, has the effect of increasing the equalized value of the taxing jurisdictions by almost 100% from 2021 to 2024 to over $690,000,000. Plaintiffs assert that this will allow MISD to propose another referendum and borrow as much as another $34,000,000, which will have the

effect of imposing substantial additional tax burdens on the property tax–paying properties. *Id.* ¶ 108.

Finally, throughout the Legend Lake community, houses that have been placed into trust or are slated for transfer into trust are often kept vacant, are often poorly maintained, and are often allowed to become dilapidated. *Id.* ¶ 109. Plaintiffs assert that the level of maintenance of trust properties at Legend Lake and properties slated for transfer into trust is inconsistent with the intent of increasing or maintaining property values in Legend Lake. *Id.* ¶ 111. They contend that it is consistent with the alleged unconstitutional animus and motivation of driving the taxpaying landowners out of the County by creating a depressed or even blighted condition at Legend Lake, which will eventually cause the values of their properties to decline to zero if left unchecked. *Id.*

Based on these allegations, Plaintiffs assert five causes of action against Defendants. First, Plaintiffs assert that Defendants deprived them of their Fourteenth Amendment right to equal protection by causing Plaintiffs to be treated differently than other similarly situated landowners in Menominee County. *Id.* ¶ 114. Alternatively, Plaintiffs claim that Defendants intentionally treated Plaintiffs differently by taxing them differently and excessively. *Id.* ¶ 115. Second, Plaintiffs assert that Defendants deprived them of their Fourteenth Amendment right to substantive due process because Defendants' course of conduct has resulted in unfair and oppressive property taxes being charged to Plaintiffs, the Association, and its members and, if left unchecked, will allow the de facto confiscation of Plaintiffs' homes. *Id.* ¶ 120. Third, Plaintiffs allege that Defendants violated the rule of uniformity as set forth in Article VIII, Section 1 of the Wisconsin Constitution, which mandates uniformity of taxation. *Id.* ¶¶ 124–25. Fourth, Plaintiffs assert that Defendants are inversely condemning Plaintiffs' and the Association's property in violation of the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Wisconsin Constitution. *Id.* ¶ 128. Fifth, Plaintiffs claim that Defendants deprived Plaintiffs and the

11

Association of their rights under the "public purpose" clause of the Fifth Amendment and Article I, Section 13 of the Wisconsin Constitution by taking Plaintiffs' and the Association's members' entire property for the benefit of the Menominee Tribe. *Id.* ¶ 131. Plaintiffs request that the court grant the following relief:

> (a) Enter judgment making the following orders and declarations: 1) that the Defendants are engaging in an illegal or unconstitutional course of conduct in respect to the Plaintiffs and the LLPOA and its members;
>
> (b) Enjoin any further unconstitutional actions of the type pled in this Complaint;
>
> (c) Award Plaintiffs their costs, interest and reasonable attorneys' fees for this action pursuant to 42 U.S.C. § 1988 and other relevant statutes; and,
>
> (d) Order such other and further injunctive relief as the Court deems just and proper under the circumstances.

*Id.* at 29.

## ANALYSIS

Defendants argue that this court does not have subject matter jurisdiction over Plaintiffs' federal law claims. The court lacks subject matter jurisdiction, Defendants contend, because Plaintiffs lack Article III standing and their federal claims are barred by the Tax Injunction Act, 28 U.S.C. § 1341, as well as established principles of comity. Absent subject matter jurisdiction over Plaintiffs' federal claims, Defendants contend that the court should decline to exercise jurisdiction over Plaintiffs' remaining state-law claims under 28 U.S.C. § 1367.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the jurisdiction of a federal court over the subject matter of an action. Fed. R. Civ. P. 12(b)(1). "[A] plaintiff faced with a Rule 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014).

12

**A. Article III Standing**

Article III of the United States Constitution limits judicial power to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. If a dispute before the court is not a proper case or controversy under Article III, "the courts have no business in deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). One "landmark" of the case-or-controversy requirement is the doctrine of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "When a plaintiff lacks standing, a federal court lacks jurisdiction." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998)). The doctrine of standing is not an esoteric doctrine that courts use to avoid difficult decisions; it "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To establish standing, the litigant must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 561 (citations omitted). Defendants argue that Plaintiffs have failed to show an injury in fact and that their claims are not redressable by this court.

**1. Injury in Fact**

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be particularized, it must affect

13

the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). In other words, the plaintiff must suffer some actual or threatened injury. *Id.* Moreover, the injury must be concrete; it must actually exist and is not simply abstract or speculative. *Id.* at 340.

Plaintiffs assert that this requirement is easily met. They contend that the Association and its individual members are facing high taxes on their own property which they are required to personally pay. Indeed, according to the amended complaint, notwithstanding the fact that Plaintiffs receive little in return by way of municipal services or improvements, "[a]s of 2023, Plaintiff and [the Association's] members were paying some of the highest property taxes in the nation." Am. Compl. ¶¶ 12, 100. Plaintiffs allege that the practices they seek to challenge, if allowed to continue, "will ultimately drive property taxes so high as to make [the Association] members' ownership of property tax paying parcels prohibitively expensive and unaffordable thereby forcing their sale." *Id.* ¶ 58. The actions of the defendants, Plaintiffs allege, represent a concerted effort to take the property of the plaintiffs and other members of the Association by forcing property taxes to become so high that the owners of taxable land will be coerced into selling their land to the Menominee Tribe, which will then have it placed in trust, thereby accomplishing the Tribe's goal. From these allegations, it would appear that Plaintiffs have alleged a concrete and particularized injury in fact, i.e., the diminution or loss of their property, both personal and real.

Defendants contend, however, that this issue is controlled by the Supreme Court's decision in *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) In that case, a group of taxpayers challenged an agreement under which DaimlerChrysler was offered local and state tax benefits in return for the expansion of its jeep manufacturing operation in Toledo, Ohio. The promised benefits included a credit against the state franchise tax and a partial waiver of local property taxes. *Id.* at 338–39. The plaintiff taxpayers sued, "alleging that their local and state tax burdens were

increased by the tax breaks for DaimlerChrysler, tax breaks that they asserted violated the Commerce Clause." *Id.* at 338. The Court concluded it had no need to decide whether the taxation arrangement violated the Commerce Clause because the plaintiff taxpayers did not have "standing to press their complaint in federal court." *Id.*

In so ruling, the Court relied in part upon *Frothingham v. Mellon*, 262 U.S. 447 (1923), in which a federal taxpayer sued the Secretary of the Treasury to enjoin the expenditure of federal funds for a program that allegedly exceeded Congress' constitutional authority to enact. The taxpayer argued that she would suffer injury if the funds were expended in the form of higher taxes and, thus, a taking of her property without due process of law. *Id.* at 486. The Court rejected this argument, noting that the interest of a federal taxpayer in the moneys of the treasury "is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Id.* at 487. In *DaimlerChrysler*, the Court held that *Frothingham*'s rationale for rejecting taxpayer standing "applies with undiminished force to state taxpayers." 547 U.S. at 345. Defendants contend that the same rationale applies here and, thus, Plaintiffs' claims meet the same fate as those of the taxpayers in *DaimlerChrysler*.

Plaintiffs note, however, that neither *Frothingham*, nor *DaimlerChrysler*, decided whether payers of real estate taxes imposed by a municipal or county government could have standing to sue in federal court. The plaintiff in *Frothingham* was a federal taxpayer challenging federal spending, and the plaintiff taxpayers in *DaimlerChrysler* challenged a franchise tax credit granted by the state. Although *DaimlerChrysler* also involved a municipal property tax waiver, the plaintiffs failed to raise any issue regarding their standing as municipal taxpayers in the Supreme Court. 547 U.S. at 349 ("Plaintiffs here challenged the municipal property tax exemption as

15

municipal taxpayers. That challenge was rejected by the Court of Appeals on the merits, and no issue regarding plaintiffs' standing to bring it has been raised."). Thus, *DaimlerChrysler* did not reject municipal taxpayer standing; to the contrary, the Court observed that "the *Frothingham* Court noted with approval the standing of municipal residents to enjoin the 'illegal use of the moneys of a municipal corporation,' relying on 'the peculiar relation of the corporate taxpayer to the corporation' to distinguish such a case from the general bar on taxpayer suits." *Id.* (quoting *Frothingham*, 262 U.S., at 486–87); *see also ASARCO, Inc. v. Kadish*, 490 U.S. 605, 613–14 (1989) ("We have indicated that the same conclusion may not hold for municipal taxpayers, if it has been shown that the peculiar relation of the corporate taxpayer to the [municipal] corporation makes the taxpayer's interest in the application of municipal revenues direct and immediate." (internal quotation marks omitted)). The Seventh Circuit has characterized municipal taxpayer standing as "a bit of a relic" but has also noted that the rule "remains undisturbed," though "increasingly anomalous." *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 733 (7th Cir. 2020). Because the Supreme Court has not overruled its cases recognizing standing for municipal taxpayers, however, lower courts must continue to apply it. *Id.* at 734.

Municipal taxpayer standing has two requirements: (1) the plaintiff must actually be a taxpayer of the municipality he wishes to sue; and (2) the plaintiff must establish that the municipality has spent tax revenues on the allegedly illegal action. *Id.* The individual Plaintiffs and the Association's members clearly meet the first requirement. They are taxpayers of the County, the Town, and the School District. The second requirement is intended to ensure that "the taxpayer's action . . . is a good-faith pocketbook action." *Id.* (quoting *Doremus v. Bd. of Educ.*, 342 U.S. 429, 434 (1952)). "The plaintiff must be able to show that she has the requisite financial interest that is, or is threatened to be, injured by the municipality's illegal conduct." *Id.* (internal quotation marks omitted). This requirement is also met.

16

Plaintiffs allege that Defendants have acted unconstitutionally and with purpose and intent to increase their property taxes to a level that will force them to sell their property to the Menominee Tribe. Am. Compl. ¶ 103. Plaintiffs further allege that MISD has transferred valuable property to the Tribe for substantially less than fair market value, entered into contracts with the Tribe that are not in the public interest or the interest of MISD, and removed from the tax rolls property owned by the Tribe or its agents without authorization.

This is enough to show an injury in fact, at least at the pleading stage. But to establish standing under Article III, Plaintiffs must also show that their injury is likely to be redressed by a favorable decision by the court. It is to that requirement that the court now turns.

## 2. Redressability

To show that a claim is redressable, a plaintiff must demonstrate that there is "a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)). "Redressability turns on the 'connection between the alleged injury and the judicial relief requested.'" *Pavlock v. Holcomb*, 35 F.4th 581, 588 (7th Cir. 2022) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). "Redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment)). "To establish Article III redressability, the plaintiffs must show that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020).

In this case, Plaintiffs assert that Defendants' actions which, if allowed to continue, will eventually render their properties valueless. Am. Compl. ¶¶ 118, 121, 126, 129, 132. The amended complaint requests that the court enter judgment granting them two forms of relief: (1) declaring "that the Defendants are engaging in an illegal or unconstitutional course of conduct in respect to the Plaintiffs" (declaratory relief); and (2) enjoining "any further unconstitutional actions of the type pled in this Complaint" (injunctive relief). *Id.* at 29. Neither form of relief, as stated, meets the redressability requirement for Article III standing.

For starters, Plaintiffs' request for declaratory relief fails to redress their alleged injury. Although Plaintiffs' alleged injury is diminution in property value, their request for declaratory relief merely asks the court to pronounce that Defendants are violating the Constitution. Such declaratory relief would not repair Plaintiffs' property values, however. What Plaintiffs seek through their request for declaratory relief is a "vindication of the rule of law—the 'undifferentiated public interest' in faithful" adherence to constitutional imperatives. *Steel Co.*, 523 U.S. at 106 (quoting *Lujan*, 504 U.S. at 577). But it is not enough that a plaintiff "will be gratified by seeing [a defendant] punished for its infractions and that the punishment will deter the risk of future harm." *Id.* at 106–07. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Id.* at 107. In short, Plaintiffs have not plausibly alleged that their injuries are redressable by the declaratory relief they seek.

Plaintiffs' request for injunctive relief suffers from a different problem. The injunctive relief Plaintiffs seek is quite broad in that it simply asks that the court "[e]njoin any further unconstitutional actions of the type pled in this Complaint." Am. Compl. at 29. Granting such an injunction would violate Rule 65(d)(1)(C), which requires that every order granting an injunction "describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d)(1)(C). "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive

18

orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.* Moreover, entry of such an order would in effect place the court in the position of the elected officers of Defendants: "When the only way to make relief effective is to write an order so broad that it becomes advisory, and so meddlesome that it effectively appoints a federal judge as the administrator of the state statute, a court can be sure that the case is not justiciable." *Wisconsin Right to Life, Inc. v. Paradise*, 138 F.3d 1183, 1187 (7th Cir. 1998).

Citing *Hutto v. Finney*, 437 U.S. 678 (1978), and *Brown v. Board of Education*, 349 U.S. 294 (1955), Plaintiffs argue that federal courts have exercised broad equitable power to bring ongoing constitutional violations to a halt. Dkt. No. 34 at 19–20. But the injunctive relief Plaintiffs seek is far broader and less defined than the injunctive relief upheld in *Huto* or *Brown*. *Huto* dealt with the conditions under which inmates in a state prison were being held, conditions which were found to constitute cruel and unusual punishment in violation of the Eighth Amendment. 437 U.S. at 681–83. The district court eventually entered a remedial order "that placed limits on the number of men that could be confined in one cell, required that each have a bunk, discontinued the 'grue' diet, and set 30 days as the maximum isolation sentence." *Id.* at 684. This is far more specific than the injunctive relief Plaintiffs request here and falls well within the kind of relief courts are empowered to provide. And in *Brown*, the Court remanded to the lower courts out of which the case arose to enter appropriate orders effectuating the Court's decision holding racial segregation of public schools unconstitutional. An order to the end racial segregation in a local school district is sufficiently detailed for any reasonable person to understand. Here, by contrast, Plaintiffs ask

19

the court to "[e]njoin any further unconstitutional actions of the type pled in this Complaint." Am. Compl. at 29. Left unsaid is what those actions are that Plaintiffs wish the court to enjoin.

But the amended complaint also requests "such other and further injunctive relief as the Court deems just and proper under the circumstances." *Id.* Plaintiffs offer greater specificity as to what such relief might look like in their brief in opposition to Defendants' motion to dismiss. There they suggest that, depending on what is produced in discovery, MISD could be ordered to "create and implement a plan that will ensure that MISD funding will be primarily obtained from sources other than the taxation of the taxable parcels within the County and that no parcel of taxable property within Menominee County and the Town of Menominee shall be charged an amount of additional tax by MISD which deviates by more than 10% above the average additional tax charged per thousand dollars of value in [neighboring] Shawano County . . . ." Dkt. No. 34 at 21. Plaintiffs also argue that the court could overturn the 2006 agreement between the Menominee Indian Tribe and the County under which some 270 properties owned by the Tribe or agents of the Tribe have been removed from the tax roll even though they have not been transferred to the United States in trust for the Tribe. They argue that the court could order Defendants "to implement immediate measures to ensure enforcement of penalties on non-Trust properties that have stopped paying taxes." *Id.* Finally, Plaintiffs suggest that court could order Defendants "to create and implement a plan to document and ensure that no financial decisions are based on the unconstitutional motivation of increasing the tax burden on the Plaintiffs, to provide transparency, and to document sound cost-benefit analyses." *Id.* Under Plaintiffs' proposal, the court would "retain jurisdiction of this matter to ensure adequate compliance with [the court's] order." *Id.*

In effect, some of the relief Plaintiffs suggest would require the court to oversee the funding and operation of the County, Town, and MISD and substitute its judgment for that of the elected officials charged with implementing the policies favored by those who placed them in office. The

Wisconsin Constitution provides that "the [Wisconsin] legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods." Art. VIII, § 1. The State's Constitution also empowers municipalities, including school districts, to determine their local affairs and government, debt limit, and taxes, subject to the limitations therein. Art. XI, § 3. Plaintiffs' suggestion that the court can order the County, Town, and MISD to set a tax rate for Plaintiffs' property or "to create and implement a plan to document and ensure that no financial decisions are based on the unconstitutional motivation of increasing the tax burden on the Plaintiffs, to provide transparency, and to document sound cost-benefit analyses" exceed this court's authority. Dkt. No. 34 at 21. The Ninth Circuit's decision in *Juliana v. United States* is instructive on this point. 947 F.3d at 1169–73.

In *Juliana*, twenty-one young citizens, an environmental organization, and a "representative of future generations" brought an action seeking declaratory and injunctive relief against the United States, the President, and various federal officials, alleging that the defendants continued to permit, authorize, and subsidize fossil fuel extraction, development, consumption, and exportation, thereby allowing carbon dioxide emissions to escalate and cause harmful climate change. The plaintiffs asserted claims for violations of substantive due process, equal protection, the Ninth Amendment, and the public trust doctrine. *Id.* at 1164. After denying the government's motions to dismiss and for summary judgment on standing grounds, the district court certified its orders for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Id.* at 1165–66. On appeal, the Ninth Circuit reluctantly concluded that "such relief is beyond our constitutional power" and that the plaintiffs' case for redress "must be presented to the political branches of government." *Id.* at 1165.

In so ruling, the court noted that "[t]he crux of the plaintiffs' requested remedy is an injunction requiring the government not only to cease permitting, authorizing, and subsidizing

21

fossil fuel use, but also to prepare a plan subject to judicial approval to draw down harmful emissions." *Id.* at 1169. The plaintiffs thus seek, the court explained, "not only to enjoin the Executive from exercising discretionary authority expressly granted by Congress, . . . but also to enjoin Congress from exercising power expressly granted by the Constitution over public lands . . . ." *Id.* (citations omitted). Even assuming that the relief plaintiffs requested would reduce the damage to the planet allegedly caused by fossil fuel emissions, the court concluded, the plaintiffs failed to establish that the specific relief they sought was "within the power of an Article III court." *Id.* at 1171.

Similarly, in this case, Plaintiffs seek not only to enjoin Defendants from carrying out their constitutional duties as elected members of their respective governing bodies, but to have this court create and implement a plan that would assure Plaintiffs that the taxes assessed on their property are fair and reasonable by both setting the rate and controlling the expenditures of the governmental entity imposing them. These are powers the court does not have. "A federal court's function is to protect individuals and groups against intentional discriminatory and disparate treatment, not to oversee the operations of local governments and agencies." *Pappas v. Town of Enfield*, 18 F. Supp. 3d 164, 178 (D. Conn. 2014). "When the only way to make relief effective is to write an order so broad that it becomes advisory, and so meddlesome that it effectively appoints a federal judge as the administrator of the state statute, a court can be sure that the case is not justiciable." *Wisconsin Right to Life*, 138 F.3d at 1187.

The same considerations may not apply to Plaintiffs' request that the court "overturn the 2006 agreement between the Menominee Indian Tribe and the County under which some 270 properties owned by the Tribe or agents of the Tribe have been removed from the tax roll even though they have not been transferred to the United States in trust for the Tribe." Dkt. No. 34 at 22. Granting this narrow relief would not require the court to take over the financing and

22

operations of the School District. In *Allegheny Pittsburgh Coal Co. v. County Commissioner of Webster County*, the Court held that assessments on real property by a West Virginia county violated the equal protection clause where recently sold property was assessed at 50% of the purchase price, which was roughly 8 to 35 times more than comparable neighboring property which had not been recently sold and those discrepancies had continued for more than ten years. 488 U.S. 336, 341–43 (1989). If the kind of discrepancy shown in that case violates the Equal Protection Clause of the Fourteenth Amendment, it is hard to see how removing parcels owned by the Tribe or its agents entirely from the tax rolls would not. *See also Morton Salt Co. v. City of South Hutchinson*, 159 F.2d 897, 902 (10th Cir. 1947) ("The allegation in the complaint to the effect that the taxpayer will be required to pay 46% of the tax burden for a city improvement which will not be available to it, and from which it can receive no benefit, certainly poses a serious constitutional question."). And while it is not clear that including those parcels on Defendants' tax rolls would provide much, if any, redress to Plaintiffs, at least at this point the court is unable to say it would not. Accordingly, at least as to this potential form of relief, the court is unable to conclude from the amended complaint that Plaintiffs lack standing.

**B. Tax Injunction Act and Comity**

Defendants further contend, however, that the Tax Injunction Act (TIA), 28 U.S.C. § 1341, and principles of comity bar the court from granting even this limited relief. The TIA states: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." Ordering the inclusion of other parcels on the tax rolls would "not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law." 28 U.S.C. § 1341. Thus, it is hard to see how allowing the case to go forward for this limited relief would violate the Act. But considerations underlying the doctrine of comity reach more broadly than the Tax Injunction Act.

23

*Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 424 (2010) (noting that "our precedents affirm that the comity doctrine is more embracive than the TIA").

The comity doctrine "reflects the reluctance of federal courts to 'interfere by injunction with [states'] fiscal operations' and the concomitant desire to show 'scrupulous regard for the rightful independence of state governments.'" *Perry v. Coles County, Illinois*, 906 F.3d 583, 587–88 (7th Cir. 2018) (quoting *Matthews v. Rodgers*, 284 U.S. 521, 525 (1932)).  More specifically, "the comity doctrine bars taxpayers from asserting § 1983 claims against 'the validity of state tax systems' via federal lawsuits."  *Id.* at 588 (quoting *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 (1981)); *see also Capra v. Cook Cnty. Bd. of Review*, 733 F.3d 705, 713 (7th Cir. 2013) ("*Fair Assessment* has been applied consistently to bar plaintiffs from bringing section 1983 suits challenging the validity or imposition of state and local taxes in federal courts unless the available state remedies for those injuries are not adequate, plain, and complete.").

One reason that federal district courts are required to abstain from entertaining lawsuits challenging state or local taxing schemes is that, upon finding unlawful discrimination, a federal district court would have to determine the remedy.  Discriminatory tax treatment can be remedied either by lowering the tax paid by the complaining party or increasing the tax on others.  *Levin*, 560 U.S. at 426–27.  The manner in which the violation is cured is a question for the state legislature.  *See Stanton v. Stanton*, 421 U.S. 7, 17–18 (1975) (how State eliminates unconstitutional discrimination "plainly is an issue of state law").

For this reason, "with the State's legislative prerogative firmly in mind, [the Supreme] Court, upon finding impermissible discrimination in a State's allocation of benefits or burdens, generally remands the case, leaving the remedial choice in the hands of state authorities." *Levin*, 560 U.S. at 427. The Supreme Court's remand "leaves the interim solution in state-court hands, subject to subsequent definitive disposition by the State's legislature."  *Id.* at 428.  But federal

24

district courts have no authority to remand a case to the state or local municipality. As *Levin* explained, "[i]f lower federal courts were to give audience to the merits of suits alleging uneven state tax burdens, however, recourse to state court for the interim remedial determination would be unavailable. That is so because federal tribunals lack authority to remand to the state court system an action initiated in federal court." *Id.* "These limitations on the remedial competence of lower federal courts," *Levin* concluded, "counsel that they refrain from taking up cases of this genre, so long as state courts are equipped fairly to adjudicate them." *Id.*

Thus, under both the TIA and the principles of comity, the crucial question is whether there is "a plain, speedy and efficient remedy" available in the courts of State of Wisconsin. 28 U.S.C. § 1341. Wisconsin clearly provides such a remedy. Section 74.35(2)(a) of the Wisconsin Statutes provides: "A person aggrieved by the levy and collection of an unlawful tax assessed against his or her property may file a claim to recover the unlawful tax against the taxation district which collected the tax." Subsection (3)(d) states: "If the taxation district disallows the claim, the claimant may commence an action in circuit court to recover the amount of the claim not allowed." Wis. Stat. 74.35(3)(d); *see also Saint John's Communities, Inc. v. City of Milwaukee*, 2022 WI 69, 404 Wis. 2d 605, 982 N.W.2d 78 (affirming remedy but holding that taxpayer must pay the challenged tax prior to filing claim under Wis. Stat. § 74.35); *Timber Ridge Associates by Lerner v. City of Hartford*, 578 F. Supp. 221, 224 (E.D. Wis. 1984) ("The only issue which remains is whether Wisconsin makes available to Timber Ridge a 'plain, speedy and efficient remedy' under its laws. I believe that Wis. Stat., § 74.73 provides the remedy which § 1341 requires."). A similar state-law remedy exists for the intentional omission of Tribally owned, non-trust property from the County tax rolls. Wis. Stat. § 70.44 Assessment; property omitted; *see also Semple v. Langlade Cnty.*, 75 Wis. 354, 44 N.W. 749 (1890) (affirming trial court's holding that assessment, and sale for nonpayment of taxes thereunder, can be set aside at the instance of one who has been compelled

25

to pay more than his share of the taxes by the assessor's intentional inequality in assessments, and arbitrary omissions of taxable property).

Given these readily available state law remedies, the court is satisfied that the well-established principles of comity preclude this court's exercise of jurisdiction over the federal claims asserted by Plaintiffs in this action. State courts have the same obligation to decide claims arising under the United States Constitution as federal courts. *Levin*, 560 U.S. at 421. "If the [state] scheme is indeed unconstitutional, surely the [state] courts are better positioned to determine—unless and until the [state] Legislature weighs in—how to comply with the mandate of equal treatment." *Id.* at 429.

If the allegations of the amended complaint are true, the unfairness to the property tax–paying citizens of the Town, County, and School District is apparent. Yet Plaintiffs' concerns cannot be remedied by a federal lawsuit. A court can only act within its authority. To grant the relief Plaintiffs request is for the most part beyond the power conferred upon the federal judiciary. *See Bowles v. Russell*, 551 U.S. 205, 212 (2007) ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider."). To the extent it is not, principles of federal/state comity counsel against exercising jurisdiction over Plaintiffs' federal claims. That is not to say that Plaintiffs are entirely without recourse. As noted above, relief may be available in state court. Another possibility is to petition the legislature. Indeed, anyone who believes that a law is unfair must go to the legislature itself to change that law. Perhaps there are other possibilities. But the answer does not lie with this court. Because the injunctive relief Plaintiffs seek from this court is, for the most part, beyond the court's authority to grant and, in any event, is precluded by established principles of comity, Plaintiffs federal claims must be dismissed.

## C. State Law Claims

What remains are Plaintiffs' state law claims. "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c)(3). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 502 (7th Cir. 1999) (noting that the rule is dismissal unless state claims are frivolous or a "no brainer"). Nothing in this case suggests that the presumption should be ignored. Therefore, Plaintiffs' state law claims will be dismissed without prejudice so that they may be pursued in a state forum.

## CONCLUSION

For these reasons, Defendants' motions to dismiss the amended complaint (Dkt. Nos. 26 & 28) are **GRANTED** with respect to the federal claims, and such claims are dismissed. Plaintiffs' state law claims are dismissed without prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 26th day of November, 2025.

William C. Griesbach
United States District Judge